FAX or Internet

# UNITED STATES DISTRICT COURT
## for the
## District of Arizona

In the Matter of the Search of
**Facebook User ID: 1423503533**
**Controlled by Facebook, Inc,**
**Menlo Park, CA 94025**

)
)
)
)
)

Case No.    21-4385 MB

(Filed Under Seal)

# SEALED

## ELECTRONICALLY ISSUED SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer.

An electronic application by a federal law enforcement officer for the government requests the search of the following person or property located in the ___Northern___ District of ___California___
*(identify the person or describe the property to be searched and give its location)*:
**Facebook User ID: 1423503533, controlled by Facebook, Inc., Menlo Park, CA 94025.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:  **See Attachment A.**

**YOU ARE COMMANDED** to execute this warrant on or before
December 24, 2021
*(not to exceed 14 days)*

[ ] in the daytime  6:00 a.m. to 10 p.m.     [X] at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the search warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a search warrant copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
___Any U.S. Magistrate in the D. of Arizona___ .
*(Name)*

[ ] I find that immediate notification may have an adverse result as specified in 18 U.S.C. § 3103a  (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* [ ] for _____ days *(not to exceed 30)*.
[ ] until, the facts justifying, the later specific date of _____ .

Date and Time Issued:     _____     *Camille D. Bibles*  Digitally signed by Camille D. Bibles
Date: 2021.12.10 14:33:04 -07'00'
*Judge's Signature*

City and State:   Flagstaff, Arizona _____     Camille D. Bibles, United States Magistrate Judge

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing Officer's Signature*

_____
*Printed Name and Title*

## ATTACHMENT A

## THINGS TO BE SEARCHED FOR AND SEIZED
## FROM THE SUBJECT ACCOUNT

I.      **Information To Be Disclosed by Facebook**

To the extent that the information described in the Search Warrant (user ID as 1423503533) is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, and including any messages, emails, records, files, logs, or information that has been deleted but is still available to Facebook, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each account or identifier listed in the Search Warrant (user ID as 1423503533):

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, any other associated Facebook accounts, and other personal identifiers;

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from February 10, 2020 to present;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from February 10, 2020 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      For the time period of February 10, 2020 to present, all profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall

1

postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    For the time period of February 10, 2020 to present, all records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user from February 10, 2020 to the present including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information February 10, 2020 to present;

(h)    All IP logs, including all records of the IP addresses that logged into the account from February 10, 2020 to present;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked" from February 10, 2020 to present;

(j)    All information about the Facebook pages that the account is or was a "fan" of from February 10, 2020 to present;

(k)    All past and present lists of friends created by the account from February 10, 2020 to present;

(l)    All records of Facebook searches performed by the account from February 10, 2020 to present;

2

(m)     All information about the user's access and use of Facebook Marketplace from February 10, 2020 to present;

(n)     The types of service utilized by the user February 10, 2020 to present;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to Be Seized By the Government

All information described above in Section I concerning the SUBJECT ACCOUNTS (which are described in the Search Warrant) that constitutes evidence of violations of crimes in violation of 36 C.F.R. § 2.32(a)(3)(i), 36 C.F.R. § 2.32(a)(1), 36 C.F.R. § 5.3, 36 C.F.R. § 1.5(f), and 36 C.F.R. § 1.5 and similar criminal conduct, involving Joe Mount (MOUNT), including specifically, for each account or identifier listed on the Search Warrant, information or documents pertaining to the following matters:

1.     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, any other associated Facebook accounts, Facebook passwords, Facebook security questions and answers, physical address

3

(including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

2.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from February 10, 2020 to present;

3.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them (including all metadata related to these photos as well as all content contained in the profile's "Instagram" content area) from February 10, 2020 to present;

4.    All metadata related to photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them (including all content contained in the profile's "Instagram" content area) for photographs uploaded from February 10, 2020 to present;

5.    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests from February 10, 2020 to present;

6.    All "check ins" and other location information from February 10, 2020 to present;

7.    All IP logs, including all records of the IP addresses that logged into the account from February 10, 2020 to present;

8.    All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records of use from or to Joe Mount (MOUNT) from February 10, 2020 to present;

9.    All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records of use between Joe Mount (MOUNT) and events page 49908517767278 from February 10, 2020 to present;

4

10.     All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records stating something to the effect of, "Rim-to-Rim (R2R)" and "hiking";

11.     All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records related to hiking in the Grand Canyon incident that occurred on or about October 24, 2020 in Grand Canyon National Park, Arizona;

12.     Any photographs, videos, recordings, and/or reference to MOUNT from February 10, 2020 to present;

13.     Any other records or posts relating to or mentioning Rim to Rim (R2R) or hiking in the Grand Canyon that occurred on or about October 24, 2020 in Grand Canyon National Park;

14.     Any records that document the suspect's motivation and any planning the suspect may have conducted in furtherance of the offense above, including any Facebook posts regarding activities in Grand Canyon National Park on or about October 24, 2020;

15.     Any information showing and/or depicting the location and/or time stamp of a particular photograph, video, recording, and/or document for the above-described things;

16.     Any information showing the planning, commission, and/or concealment of any of the above-referenced crimes;

17.     Any messages and/or chats discussing the above-referenced crimes;

18.     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

19.     The identity of the person(s) who created or used the user ID; and

5

20.     The identity of the person(s) who communicated with the user ID about matters relating to the crimes under investigation, including records that help reveal their identities and whereabouts.

FAX or Internet

# UNITED STATES DISTRICT COURT

for the
District of Arizona

In the Matter of the Search of:

)
)
**Facebook User ID: 1423503533,**
)      Case No. 21-4385 MB
**Controlled by Facebook, Inc,**
)
**Menlo Park, CA 94025**
)      **(Filed Under Seal)**

## ELECTRONIC APPLICATION FOR SEARCH WARRANT      **SEALED**

I, the undersigned, a federal law enforcement officer, request an electronic search warrant and state under penalty of perjury that I have reason to believe that on and within the following person or property:

**Facebook User ID: 1423503533, controlled by Facebook, Inc., Menlo Park, CA 94025.**

located in the ___Northern___ District of ___California___ , there is now concealed:
**See Attachment A.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

[X] evidence of a crime;

[ ] contraband, fruits of crime, or other items illegally possessed;

[ ] property designed for use, intended for use, or used in committing a crime;

[ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 36 CFR 2.32(a)(3)(i) | Knowingly give a false or fictitious report |
| 36 CFR 2.32(a)(1) | Intentionally interfere with government agent |
| 36 CFR 5.3 | Engage in and solicit business without a permit |
| 36 CFR 1.5(f) | Violate a closure- group size limit |
| 36 CFR 1.5(f) | Violate a closure- Covid-19 mitigation use limit |

The application is based upon the following facts:

[X] Continued on the attached sheet (see attached **Affidavit**).

[ ] Delayed notice of ___ days   (give exact ending date if more than 30 days) days:
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by: AUSA Patrick J. Scheider
**Pursuant to 28 U.S.C. §1746(2), I declare under penalty**
**of perjury that the foregoing is true and correct.**          _Robert Evans_
                                                        *Applicant's Signature*

Executed on                                        U.S. Park Ranger Robert Evans
                                                        *Printed Name and Title*

___X___ Sworn by Telephone

Date/                                              **Camille D. Bibles**  Digitally signed by Camille D. Bibles
Time: _____                          Date: 2021.12.10 14:30:20 -07'00'
                                                        *Judge's Signature*

City and State:  Flagstaff, Arizona               Camille D. Bibles, United States Magistrate Judge
                                                        *Printed Name and Title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

## ELECTRONICALLY SUBMITTED AFFIDAVIT

I am Robert Evans, an investigative law enforcement officer authorized to investigate violations of Title 18 of the United Stated Code and Title 36 of the Code of Regulations.

### INTRODUCTION

1. Purpose: I make this Affidavit in support of the Application for an Electric Search Warrant for Joseph Mount's Facebook page, because probable cause exists to believe that Mount violated:

    a. Title 36, Code of Federal Regulations, Section 2.32(a)(3): Knowingly giving a false of fictitious report or other false information (i) to an authorized person investigating an accident or violation of law or regulation.

    b. Title 36, Code of Federal Regulations, Section 2.32(a)(1): Intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty.

    c. Title 36 Code of Federal Regulations, Section 5.3: Engaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited.

    d. Title 36 Code of Federal Regulations, Section 1.5(f): Violating a closure, designation, use or activity restriction or condition schedule of visiting hours, or public use limit, is prohibited (public use rim-to-rim group size limit).

    e. Title 36 Code of Federal Regulations, Section 1.5(f): Violating a closure, designation, use or activity restriction or condition schedule of visiting hours, or public use limit, is prohibited (Covid-19 mitigation use limit).

2. <u>Affiant's Qualifications and Experience:</u> I am presently employed as a U.S. Park Ranger with the United States National Park Service, where I have worked since May 2017. I have worked in parks all over the country and have conducted criminal investigations into a variety of offenses. Prior to becoming a U.S. Park Ranger, I have completed 650 hours of instruction at the Public Safety Training Center in Santa Rosa, CA. During my tenure as a U.S. Park Ranger, I have completed approximately 640 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC). Prior to my tenure as a U.S. Park Ranger, I received my B.S. in Business Management. I am presently assigned as a sworn law enforcement officer with Grand Canyon National Park (GRCA). In that capacity, my duties including investigating federal criminal offenses in Grand Canyon National Park.

3. <u>Information Sources and Limitations:</u> I base the information in this Affidavit on information that I have learned, either directly or indirectly, from witnesses, records, and other law enforcement officers and agents. Additionally, unless otherwise indicated, conversations discussed herein are described in substance and part rather than verbatim. Likewise, I have not included each and every fact that my investigation has revealed, but rather, have included only those facts necessary to show probable cause.

## STATEMENT OF PROBABLE CAUSE

4. On 24 October 2020, Joseph Don MOUNT organized an approximately 153-person rim-to-rim hiking group from the North Rim of Grand Canyon National Park, through the inner canyon, and out the South Rim, the culmination of many months of planning, organizing and leading. J. MOUNT collected thousands of dollars from participant registration fees in exchange for services which included guide services, logistics, commercial bus transportation, and hotel lodging. J. MOUNT knowingly and willfully encouraged participants to travel through the canyon despite advisements from park officials to the contrary, provided participants with tips and

information to circumvent park laws, and denied leading any large scale-rim-to-rim groups to investigating park officials throughout.

5.  Rim-to-rim groups in excess of 30 participants are not permitted rim-to-rim through the inner canyon, defined as the areas below the Tonto Platform from the South Rim and below Manzanita Resthouse from the North Rim. Groups may not break up into smaller groups to accommodate group size (2019 signed Superintendent's Grand Canyon National Park Compendium (50)(b); 36 CFR 1.5(f)).

6.  Engaging in or soliciting any business requires a permit, contract, or other written agreement with the United States or must be pursuant to special regulations. Commercial Use Authorizations (CUAs) are required for all commercial visitor services provided by entities not based in the park (2019 signed Superintendent's Grand Canyon National Park Compendium (51); 36 CFR 5.3).

7.  On 17 September 2020, 'Asher Lawden,' a pseudonym, emailed Catherine Mosseller of the Grand Canyon Permits office to complain about a 100+ person rim-to-rim hiking group that was scheduled for 24 October 2020 at Grand Canyon National Park. A. Lawden submitted several Facebook screenshots as evidence of the group's intentions. In the first set of screenshots, J. MOUNT posted "112 COMMITTED HIKERS COMING FROM 12 DIFFERENT STATES!!!!" and added "if you want to keep inviting friends, I am determined to make this work for as many who want to go!" Screenshots of a Facebook feed revealed that several participants had "paid Joe Mount."

8.  On or about 21 September 2020, A. Lawden submitted additional screenshots of J. MOUNT's Facebook event page to C. Mosseller. In one screenshot, J. MOUNT wrote the following to a participant: "But there are precautions we might need to take so as to [sic] not draw attention to such a large group while on the trail. A natural spread might be best. Will research this more and present details/meet ups/hiking plans in posts to follow over the coming weeks."

9. Despite posts and emails to the contrary, Mr. Mount denied to a park official that he was planning any sort of large-scale rim-to-rim hike. On 21 September 2020, J. MOUNT contacted Catherine Mosseller of the Grand Canyon Commercial Permits Office. C. Mosseller reported that J. MOUNT had said he was taking a group of 12 people rim-to-rim. However, according to Facebook posts, J. MOUNT already had approximately 118 people registered by that date. C. Mosseller wrote she had told J. MOUNT the "Maximum group size was 11" and "Groups of 10 or less people do not require a permit." She wrote that J. MOUNT asked about splitting the group up to accommodate the group size limit, to which C. Mosseller stated "this was not allowed."

10. On 22 September, C. Mosseller emailed A. Lawden to say "I provided him [J. MOUNT] with the rules and regulations and told him multiple times about the group size limit."

11. According to posts on the Facebook group event page, J. MOUNT continued to defy park regulations despite receiving official advisements from a park employee in the permits office. These Facebook posts show that J. MOUNT continued to plan, manage, lead and recruit participants for the rim-to-rim hiking event.

12. On 23 September 2020, two days after his conversation with C. Mosseller, J. MOUNT posted: "ONE MORE DAY TO SIGN UP!" In this post, he advised participants to answer his "9" questions, some of which concerned carpool groups, cabin arrangements, gender preferences, walkie talkie subgroups, and prior rim-to-rim experiences.

13. On 1 October 2020, J. MOUNT posted a shared housing arrangement document, entitled Grand Canyon R2R Housing. He posted "It has taken me way too long trying to figure out everyone's friend groups and preferences." J. MOUNT asked participants to collaborate in completing these room assignments within a set of parameters that he established.

14. That same day, J. MOUNT posted a draft "Preliminary Hour-by-Hour Itinerary" encompassing multiple days.

15. On 2 October 2020, Park Ranger Timothy Hopp contacted A. Lawden by telephone.  During the phone call, A. Lawden identified J. MOUNT as the group organizer and said he was charging participants $95 via the cashless app, VENMO.  A. Lawden said he had informed J. MOUNT a permit may be required to conduct commercial activities at Grand Canyon.

16. On 5 October 2020, J. MOUNT posted an "Important Announcement," in which he asked participants to submit a list of questions for him to answer.  He wrote "As trip leader, this helps prevent redundancy."  He posted a refund policy, telling participants "preparation is paramount" and "you have 2 weeks to request a full refund and I will VENMO you the $95 back" and everyone else should "TRAIN HARD!!!"

17. On or about 6 October 2020, USPR C. Oakes joined the Facebook group event page with help from A. Lawden, allowing park investigators to see all past, present and future group-related posts and comments.

18. On 6 October, J. MOUNT posted a draft financial spreadsheet.  J. MOUNT wrote that the group is "$53 'in the green'" and he currently has "170" participants signed up.  The financial spreadsheet showed allocated costs for hotel rooms, buses, fuel, drivers, tips and walkie talkies.  According to the spreadsheet, the total budget was $16,340.

19. On 8 October 2020, Park Ranger Timothy Hopp contacted J. MOUNT regarding the planned rim-to-rim hike.  Despite posts and emails to the contrary, Mr. Mount denied to Ranger Hopp that he was planning any sort of large-scale rim-to-rim hike.  Despite having upwards of 170 participants registered at that moment, J. MOUNT stated to the Ranger Hopp that he was not taking a 'large group' of people across the canyon, that he had only been inquiring about taking a 'small group' composed of close rugby associates and family friends.  Ranger Hopp stated approximately a dozen times the group size limit for rim-to-rim groups is 11 people and groups cannot be split up to accommodate or circumvent the group size limit during the Covid-19

pandemic. Ranger Hopp added that in non-pandemic years, a Special Use Permit (SUP) is required for rim-to-rim hiking groups of between 12 and 30 people and that under no circumstances can organized groups exceed 30 people in a non-pandemic year.

20. On 9 October 2020, J. MOUNT posted an "IMPORTANT ANNOUNCEMENT" in which he wrote he had received a "call from Ranger Hopp" who "instructed that R2R group sizes are to be 11 people or less."

21. J. MOUNT posted the following weblink from Grand Canyon National Park: https://www.nps.gov/grca/learn/management/sup.htm.

22. J. MOUNT posted the following content from the weblink regarding rim-to-rim hiking group size:

a. "Organized Group Rim-to-Rim and Extended Day Hike/Run

Groups whom must obtain a permit:

Organized Non-Commercial Groups are defined as any group traveling together, such as scouts, a club, a church, a meet up group, or a family/friend group that has created its own itinerary. Group size - 1-11 people. Permits are required for group sizes of 11. Ten people or less do not require a permit."

23. J. MOUNT published a disclaimer, in which he wrote some of the following:

a. "It's best I back down as trip leader. However, the cabins/hotels in Kanab are still booked. You still have a bed spot if you want it....anyone who makes it to the South Rim October 24th will have a guaranteed ride back to the North Rim."

b. "As you could imagine, a park official telling me I can't hike the R2R with more than 11 people isn't going to prevent me from doing one of the greatest hikes in the planet."

c. "Remember – there is nothing stopping you from hiking the Grand Canyon on this day. There is nothing stopping you from doing a little research to be best prepared. However,

there is now a target on my back and this is the best way I know how to still hike R2R and not be tied to any of you."

    d.  "I hope you all recognize the position I'm in. I've spent countless hours organizing this, but when Ranger Hopp calls up…I must separate myself from all of you."

24. J. MOUNT knowingly interfered with park agency functions by encouraging participants to circumvent park rules. In Facebook posts, J. MOUNT advised participants that the group size rim-to-rim hiking limit is 11 and told them to "Organize groups of 11 or less…. To be safe, I'd suggest 10 or less." He directed participants to avoid "12 or more people in [their] group doing the R2R" because "you could be stopped and cited by park enforcement officers." He suggested everyone bring walkie-talkies "as part of YOUR OWN individual hiking group" because "I will not be providing these because again – it ties me to you WHILE IN THE CANYON." He continued: "Remember – there is nothing stopping you from hiking the Grand Canyon on this day. There is nothing stopping you from doing a little research to be best prepared." Those who go, he continued, will have "guaranteed" access to lodging and shuttle services when the hike is completed.

25. J. MOUNT wrote "I am still planning to hike the Grand Canyon" and a "park official telling me I can't hike the R2R with more than 11 people isn't going to prevent me from doing one of the greatest hikes on the planet." J. MOUNT continued: "Ranger Hopp – this is my plausible deniability. I am no longer leading a group through Grand Canyon on 10/24. I am simply going with my 10 (or less) closest friend and family." He added: "won't be a coordinated hike while ON THE TRAIL" and all "can come or not." J. MOUNT wrote that he would be "following the same itinerary with MY OWN group of 11 or less….you are welcome to do the same…independent of me" and reminded participants "you ARE NOT WITH ME ON THE TRAIL."

26. J. MOUNT knowingly and willfully violated Grand Canyon's rim-to-rim pubic use group size limit of 30 individuals. On 18 October 2020, J. MOUNT posted "153. Final list. Check it." J. MOUNT published a list of every participant and advised everyone of the "MUST BRING ITEMS" to include headlamps, appropriate clothing for the temperatures, first aid material, walkie talkies, park passes, "proven" hiking shoes, and a "positive 'can do, will do' attitude."

27. On 20 October 2020, J. MOUNT posted his intent to ensure accountability of each person and guaranteed everyone would have a shuttle ride back to Kanab. He stated "IF YOUR NAME IS BELOW, I AM WAITING ON THE SOUTH RIM UNTIL I SEE YOU'VE MADE IT ONTO A VAN OR BUS" and that "I will stay all night if I have to" and that "Making sure ever [sic] single person is accounted for is my #1 prerogative."

28. J. MOUNT posted the final group itinerary, directing everyone to "SAVE A COPY TO YOUR PHONES." The itinerary showed Check-in at the Red Canyon Cabins and Quality Inn in Kanab, Utah, for Friday, 23 October 2020, and a "Weekend overview & Logistics" talk at 9 PM at the Quality Inn Conference room. Regarding the 0640 (Utah time) start time, J. MOUNT added "IF YOU CHOOSE TO DO THIS, YOU ARE OYO [on your own] TRAILHEAD TO TRAILHEAD.

29. On 22 October 2020, J. MOUNT posted a selfie with three white passenger vans as a backdrop. He wrote "Picking up the vans in Vegas. Shout out to my van drivers...for helping make all this work."

30. On 23 October 2020, J. MOUNT posted check-in procedures for participants. He asked everyone to "Check in through me, not the front desk" because "I have every room key."

31. On 24 October 2020, at about 0500 hours, the J. MOUNT group arrived at the North Kaibab trailhead on the North Rim. Many passenger cars came, including a string of 12 vehicles in rapid succession. Clusters of people walking to the trailhead had begun gathering at the North Kaibab trailhead. Park Ranger Timothy Hopp observed about 50 people mingling at the trailhead water

station. A few people had told Park Ranger Timothy Hopp that they were with the 'MOUNT group' and that they were expecting to be picked up by a passenger bus on the South Rim. However, nearly all groups were extremely reluctant to speak about their plans, their leader, and their event. Park Ranger Timothy Hopp observed many clusters of people – several in excess of 11 – leave the trailhead at separate times from about 0500 hours to 0540 hours.

32. Preventative Search and Rescue (PSAR) Ranger Andrew Sprutta was in plainclothes at the North Kaibab trailhead. PSAR A. Sprutta wrote "200-250 people departing the [North Kaibab] trailhead" between about "0455 and 0630 hours." He added "Many of the hikers told me that they were part of a large group of a 100 or more from all over."

33. The J. MOUNT group made its way through the canyon. Preventative Search and Rescue (PSAR) Ranger Cody Allinson, who was stationed at the Manzanita Resthouse, observed "organized groups of 9 to 10 people entered the day use area near Manzanita Ranger Station. From approximately 0730 and 0800 I witnessed approximately 150 people enter the Manzanita day use area. At peak of visitation, there were approximately 70 people within the day use area, an area which is roughly the size of half a basketball court. In my 7 months of work…I have never have [sic] witnessed so many individuals travelling in the same direction in such a condensed period of time and space." PSAR Ranger C. Allinson added people were "unable to properly socially distance" since most people were "not wearing face coverings." PSAR Ranger C. Allinson stated that everyone had said they had "9 or 10" people in their group and that when asked how they knew each other, group members said "they only knew a few people in their group but would not explain how they met."

34. Park backcountry visitor Ricard Landon wrote in a complaint on 24 October 2020 that while hiking on the North Kaibab trail, he was "Overwhelmed with very high numbers of people coming from the North Rim." He felt the "quality of our hike [was] extremely diminished"

because it "took an additional two hours to finish our itinerary to the North Rim as we waited

for people all morning long," including long lines at get water at the Manzanita Resthouse where

"we saw about 80 people" without any "social distancing."

35. Park visitor Brian Duane encountered the group on the North Kaibab Trail and stated: "We

encountered a BIG group of hikers...there was no social distancing, nobody was wearing masks,

the group size was way out of control...This alone delayed our progress significantly....It seemed

that at least part of this was an organized group."

36. The J. MOUNT hiking group fragmented into clusters as it continued across the canyon.  Upon

reaching Indian Garden, Interpretative Ranger Brandon OATES wrote in his statement that the

groups "did not interact, avoided talking to each other, or pretended not to know each until

they were leaving." He overheard group participants "talking to each other about remaining in

smaller groups to prevent being seen in larger groups" and observed "Small radios were used to

communicate between smaller groups."

37. USPR Katherine McHugh, while stationed at Indian Garden, contacted two J. MOUNT group

hikers, Mike Julian and Ashely Hedlund.  USPR K. McHugh wrote the two hikers admitted they

were with the MOUNT group, and "MOUNT advised them that they were hiking on their own

now since the National Park Service advised him not to bring a large group on a rim-to-rim hike."

USPR K. McHugh wrote that M. Julian and A. Hedlund "paid him [J. MOUNT] $95" for the hike.

38. PSAR Ranger William Wise was on patrol at the Bright Angel trailhead between 1510 hours and

1705 hours.  He stated he had contacted many rim-to-rim groups and they said they "were part

of a 'large group.'" PSAR Ranger W. Wise contacted a group of four participants, and they stated

to him that they were "'hiking as part of a large group – but don't worry, we split up.'" PSAR

Ranger W. Wise continued to talk to J. MOUNT group participants, including a woman in her 20s

who "confirmed that the shuttle vans were supposed to start at 6pm." He also observed a J.

MOUNT group leader using a "white 'walkie-talkie' style radio with grey digital camouflage pattern...to communicate" with individuals on the trail.

39. PSAR Ranger Anne Jehle, who was shadowing USPR C. Oakes, was patrolling the Bright Angel trailhead and had contacted several J. MOUNT participants. PSAR Ranger A. Jehle wrote she had contacted about 10 rim-to-rim hikers who "stated they were associated with the large, organized group led by Joe Mount." She wrote that she had spoken to a male subject and asked him if he were associated with the J. MOUNT group, to which the man replied in the affirmative and then "bumped [her] on the shoulder and stated that he was not supposed to tell [her]."

40. USPR Adam Sherman drove south to Tusayan and contacted Jason Parry of JetLimo, a driver of one of the passenger charter buses associated with the J. MOUNT group. J. Parry showed accountability documents and text messages from J. MOUNT. In one such document, J. MOUNT had written: "One of the passengers (or the bus driver himself/herself) MUST text me a picture of the paper prior to leaving Tusayan. This will indicate to me which 56 passengers are on each of the two buses (totaling 112)." J. MOUNT advised the driver to "communicate with me via my cell: 360-269-3974 (text/call)."

41. J. Parry also showed text messages from J. MOUNT. In one such text message, J. MOUNT wrote: "The reason I booked the bus from our hotel in Kanab to the north rim [sic] is because we have about 30 personally owned vehicles sitting there that my hikers left this morning. They need to be able to get there to retrieve the vehicles and get back to Kanab."

42. Grand Canyon National Park Superintendent, Edward T. Keable, had enacted a Covid-19 mitigation plan that temporarily modified commercial group size limits to 10 individuals, including guides and drivers. Through his investigation, USPR A. Sherman learned that JetLimo did not have a Covid-19 mitigation plan. J. MOUNT disregarded the park's Covid-19 mitigation plan by instructing JetLimo driver J. Parry to transport an excessive number of people to the

North Rim of Grand Canyon on 25 October 2020 and coordinating a trip of more than 10 individuals.

43. USPR A. Sherman contacted J. MOUNT shuttle van drivers Contessa Mensink and Joseph Dillion. USPR A. Sherman wrote that he "saw these drivers transport 12 hikers in their vehicles...from the park to the motor coaches in Tusayan multiple times. Neither Dillion nor Mensink had valid CUAs to legally transport paying passengers in Grand Canyon National park," nor did they have Covid-19 mitigation plans.

44. On 25 October 2020, after the event, PSAR Ranger A. Jehle was dispatched to the Bright Angel trailhead for a medical patient. While at the trailhead, PSAR Ranger A. Jehle wrote that she was talking to the patient's friend who was upset that the patient was left behind by the J. MOUNT group. A. Jehle stated that the unidentified friend said "the patient was resistant to calling for help...due to her understanding that the National Park Service charges $10,000 for Search and Rescue services. The patient's close male friend stated that someone in the organized group had informed the patient that calling for help would result in a charge of $10,000; he stated that the patient was nervous she would be charged that sum of money and avoided seeking help."

45. J. MOUNT's efforts in coaching participants to circumvent park rim-to-rim hiking rules complicated and interfered with investigative efforts into the organized rim-to-rim group. USPR C. OAKES wrote due to "hikers' obvious reluctance to speak with me in a forthcoming manner, I did not obtain much significant or specific information. I was frequently told that MOUNT was believed to still be down in the canyon, and throughout my time at the trailhead I was often told that he was about '30 minutes down trail.'"

46. USPR A. Sherman wrote in his statement "Every participant I contacted was not willing or cooperative with us. It was obvious they had been coached not to identify with their fellow trip

participants." USPR A. Sherman attempted to call J. MOUNT to ask for his location within Grand Canyon. According to USPR A. Sherman, J. MOUNT declined to "tell [him] his location."

47. Interpretive Ranger B. Oates wrote in his statement: "Groups appeared to be coached or instructed to avoid talking to Park Rangers in uniform," and added that "Groups said they were below 10 people" and that "members did not know everyone in their group."

48. USPR Katherine McHugh stated "Many hikers throughout the day were evasive and inconsistent with me and I suspected many hikers were avoiding ranger contact or being untruthful in their responses to my questions."

49. J. MOUNT knowingly and willfully disregarded the park's Commercial Use Authorization (CUA) requirements by conducting or engaging in commercial operations in the park without a permit. Park Ranger Timothy Hopp had advised J. MOUNT during the phone call on 8 October 2020 that any person soliciting business in the park, or engaging in business in the park, such as by collecting funds and organizing services, requires a CUA permit, and that engaging in business within the park without a permit is prohibited.

50. J. MOUNT collected registration fees in exchange for services and hired staff to assist with operations. J. MOUNT charged participants a $95 registration fee, which included rim-to-rim guidance, trip itinerary, transportation and lodging services. J. MOUNT posted he collected about $15,185 from his participants for the rim-to-rim hiking event. According to posts and documents, J. MOUNT planned to spend $15,120, which included $7000 for two National Charter buses, $849 for 3 passenger vans, $4,424 for hotel lodging, as well as $2,847 for drivers' tips, meals, fuel, carpool drivers, add-ons and other incidentals.

51. The financial information showed that J. MOUNT planned to compensate people for their work: $95 for each of the three van drivers and one carpool driver, $195 for "Andy's Logistics," $95 for

"Rosie's Logistics," and $800 for 8 drivers' meals, or $100 each. Another $400 was allocated for bus driver tips.

52. J. MOUNT knowingly profited from leading this commercially organized, rim-to-rim group hiking event. J. MOUNT admitted he would be receiving a net profit of "$65.11" and it would be enough to "buy...a new pair of hiking poles."

53. Following the event, on 25 October 2020, participant Mel Porter posted, "I think Joe did a fantastic job. How about we give 'our guide' a bonus for all the extra hard work he did planning an [sic] weekend of memories!!!" Participant Jessica Stoker posted "least we could do is Venmo Joe Mount $10 for putting together this experience."

### Facebook Background Information

54. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

55. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

56. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

57. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user

can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

58. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

59. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

60. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

61. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

62. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

63. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

64. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

65. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

66. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

67. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

68. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

69. As explained herein, your affiant has probable cause to believe that evidence of those vioaltions exist on the Facebook Accounts belonging to MOUNT. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crimes under investigation

70. Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.

71. Your affiant has probable cause to believe that MOUNT's Facebook account activity will provide relevant insight into the Facebook account owner's state of mind as it relates to the offenses under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

72. The Rim-to-Rim event page that was maintained and hosted by MOUNT will provide activity logs, photos, videos, status updates, friends, previous events, communication, chat history, and location information used to coordinate and plan for this event to happen.

73. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

74. Your affiant has probable cause to believe that executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment A.  Upon receipt of the information described in Attachment A, government-authorized persons will review information described in Attachment A.

## CONCLUSION

75. Based on the foregoing, your affiant respectfully submits there is Probable Cause to believe that violations of federal law have occurred, and there is evidence of the violations of Title 36 of the Code of Federal Regulations contained within MOUNT's Facebook accounts.

76. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

77. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## REQUEST FOR SEALING

78. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of

the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

79. Accordingly, your affiant respectfully requests that a search warrant be issued for the things described in Attachment A

80. I declare under penalty of perjury the information set forth above in this affidavit is true and correct to the best of my knowledge and belief.


Robert Evans
U.S. Park Ranger
National Park Service
Department of the Interior


Sworn to and subscribed before me on this _____ day of December 2021

Camille D.
Bibles

Digitally signed by
Camille D. Bibles
Date: 2021.12.10
14:30:57 -07'00'

The Honorable Camille Bibles
United States Magistrate Judge

# ATTACHMENT A

## THINGS TO BE SEARCHED FOR AND SEIZED
## FROM THE SUBJECT ACCOUNT

**I.    Information To Be Disclosed by Facebook**

To the extent that the information described in the Search Warrant (user ID as 1423503533) is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, and including any messages, emails, records, files, logs, or information that has been deleted but is still available to Facebook, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each account or identifier listed in the Search Warrant (user ID as 1423503533):

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, any other associated Facebook accounts, and other personal identifiers;

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from February 10, 2020 to present;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from February 10, 2020 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    For the time period of February 10, 2020 to present, all profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall

1

postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     For the time period of February 10, 2020 to present, all records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from February 10, 2020 to the present including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information February 10, 2020 to present;

(h)     All IP logs, including all records of the IP addresses that logged into the account from February 10, 2020 to present;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked" from February 10, 2020 to present;

(j)     All information about the Facebook pages that the account is or was a "fan" of from February 10, 2020 to present;

(k)     All past and present lists of friends created by the account from February 10, 2020 to present;

(l)     All records of Facebook searches performed by the account from February 10, 2020 to present;

2

(m)     All information about the user's access and use of Facebook Marketplace from February 10, 2020 to present;

(n)     The types of service utilized by the user February 10, 2020 to present;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to Be Seized By the Government

All information described above in Section I concerning the SUBJECT ACCOUNTS (which are described in the Search Warrant) that constitutes evidence of violations of crimes in violation of 36 C.F.R. § 2.32(a)(3)(i), 36 C.F.R. § 2.32(a)(1), 36 C.F.R. § 5.3, 36 C.F.R. § 1.5(f), and 36 C.F.R. § 1.5 and similar criminal conduct, involving Joe Mount (MOUNT), including specifically, for each account or identifier listed on the Search Warrant, information or documents pertaining to the following matters:

1.     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, any other associated Facebook accounts, Facebook passwords, Facebook security questions and answers, physical address

3

(including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

2.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from February 10, 2020 to present;

3.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them (including all metadata related to these photos as well as all content contained in the profile's "Instagram" content area) from February 10, 2020 to present;

4.    All metadata related to photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them (including all content contained in the profile's "Instagram" content area) for photographs uploaded from February 10, 2020 to present;

5.    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests from February 10, 2020 to present;

6.    All "check ins" and other location information from February 10, 2020 to present;

7.    All IP logs, including all records of the IP addresses that logged into the account from February 10, 2020 to present;

8.    All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records of use from or to Joe Mount (MOUNT) from February 10, 2020 to present;

9.    All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records of use between Joe Mount (MOUNT) and events page 49908517767278 from February 10, 2020 to present;

4

10.     All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records stating something to the effect of, "Rim-to-Rim (R2R)" and "hiking";

11.     All Facebook accesses, postings, submissions, conversations, messages, photographs, videos, documents, and/or records related to hiking in the Grand Canyon incident that occurred on or about October 24, 2020 in Grand Canyon National Park, Arizona;

12.     Any photographs, videos, recordings, and/or reference to MOUNT from February 10, 2020 to present;

13.     Any other records or posts relating to or mentioning Rim to Rim (R2R) or hiking in the Grand Canyon that occurred on or about October 24, 2020 in Grand Canyon National Park;

14.     Any records that document the suspect's motivation and any planning the suspect may have conducted in furtherance of the offense above, including any Facebook posts regarding activities in Grand Canyon National Park on or about October 24, 2020;

15.     Any information showing and/or depicting the location and/or time stamp of a particular photograph, video, recording, and/or document for the above-described things;

16.     Any information showing the planning, commission, and/or concealment of any of the above-referenced crimes;

17.     Any messages and/or chats discussing the above-referenced crimes;

18.     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

19.     The identity of the person(s) who created or used the user ID; and

20.     The identity of the person(s) who communicated with the user ID about matters relating to the crimes under investigation, including records that help reveal their identities and whereabouts.